(19 Misc. Rep. 24.)

## MATTHEWS v. MORAN.

(Supreme Court, Appellate Term, First Department.    December 28, 1896.)

1. APPEAL—WEIGHT OF EVIDENCE.
     A horse was sold with warranty conditioned that it might be returned with-
     in a certain time if not as warranted.    The seller refused to accept it back on
     the ground that it was injured by the buyer's having thrown it in testing it.
     *Held*, that a finding that it was not necessary to throw the horse in order to
     control it was warranted by evidence that the buyer had driven it for a
     day and a half with but little trouble, though at times it showed a tendency
     to plunge, shy, and bolt; and there was undisputed evidence given, by em-
     ployés of the buyer who drove the horse and threw it, that on the second
     day, after acting badly, the horse got on the sidewalk, and could not be held
     back, and that, in order to get control of it, they were obliged to throw it.

2. ACTIONS—REAL PARTY IN INTEREST.
     When a check given by the buyer to an auctioneer on the sale of a horse is
     indorsed to the selling owner, the indorsee may sue thereon as the real party
     in interest.

Appeal from Sixth district court.

Action by Frank Matthews against Henry S. Moran on a check
given in payment of a horse.    From a judgment for $65 and costs
in favor of plaintiff, defendant appeals.    Affirmed.

Argued before DALY, P. J., and McADAM and BISCHOFF, JJ.

William E. Morris, for appellant.

Edward B. La Fetra and La Fetra & Glaze, for respondent.

DALY, P. J.    The plaintiff was the owner of a horse, which was
sold for him by Van Tassel & Kearney, auctioneers, on Tuesday
June 9, 1896, as "Lot No. 115."    The defendant bought the horse,
induced, as he claims, by certain representations in the printed cata-
logue, and upon a warranty, and gave his check for the amount of
his bid, $65.    The next evening the horse was offered back to the
auctioneers, who refused to receive him.    On the same day, and
after such refusal, the horse was shot by an agent of the Society
for the Prevention of Cruelty to Animals because of some injury
which he sustained while in the control of the defendant, and while
he was being tested under the warranty.    Payment of the check was

stopped, and this action was brought upon it. The catalogue of the auction sale contained the following:

"The following 9 horses have been used by a wholesale grocery firm in Brooklyn, to their trucks and delivery wagons, sold only for want of use: x 115, Jim, brown horse, 15¾ hands, 8 years old; warranted kind and true in all harness, and good wind."

Eight other horses were then numbered and described. The terms of sale were as follows:

"* * * When a horse is warranted kind and true in all harness, and proves to be broken-winded, or refuses to work, the purchase money will also be returned to the purchaser. * * * The time allowed to test warranty will expire on Thursday next at 9 a. m., unless otherwise stated by the auctioneer at the time of sale."

It is claimed that there was a breach of warranty, and that the statement in the catalogue that the horse had been used by a grocery firm to their trucks or delivery wagons was false, as he had been put in the sale by a dealer who had bought him at auction a week before.

Whether the defendant had a right to return the horse under the terms of sale for breach of warranty, or in the exercise of his right to rescind the sale on the ground of fraud, his obligation was to return the animal in the same condition in which he received him, unless a change of condition occurred, without his fault, from the necessary test of the warranty, or from ordinary use while in his possession. There was a question, upon the evidence, whether the condition of the horse when returned was owing to the careless or reckless manner in which he had been handled by the defendant's employés; and, as the judgment is in favor of the plaintiff, we must assume the findings upon all the disputed questions of fact to be against the defendant.

The defendant was engaged in the laundry business at Eleventh street and Third avenue, and needed a horse to drive to his delivery wagon in collecting and distributing parcels in various parts of the city. On the day that he purchased this horse he drove him harnessed to a business wagon, and drove about 20 blocks from his place. He testified that the horse was lame; "tried to get into every basement he came across; it was something fierce; a cable car wouldn't hold him; * * * he would plunge and shy." Notwithstanding this experience, the defendant had the horse shod that night, and sent him out the next morning in charge of two of his drivers. These drivers had parcels to deliver and work to collect in different parts of the city, and completed their errands, but testified that the horse would plunge forward, would bolt, would not be held in, and, finally, on Forty-Eighth street, between Fifth and Madison avenues, got on the sidewalk, and tried to get down into basements; that one of the drivers jumped off, and got the horse by the head, and the other man on the wagon tried to hold him back, but could not, and they had to throw him. After being thrown, the horse was got up again, and they had no further trouble with him, and he got back to the defendant's stable all right. He

walked all the way, and the drivers testified that he seemed to be a little lame. That evening the defendant tendered the horse back to the auctioneers, who no sooner saw his condition than they refused to receive him. The defendant took him away, and on the way back to his place the horse fell in the street, where he was found by the agent of the society above named, and was shot.

From the evidence it might be inferred that the horse's leg was broken by his fall, and the justice was required to decide whether his injury was due to improper handling by the defendant's servants. Upon the evidence of the drivers it was a fair question whether, at the time the horse was thrown, there was any necessity for resort to such a violent measure. He had been driven the day before, and had been got back in safety, and he had been driven all the morning in various parts of the city. The drivers had finished the errands on which they were sent. The justice seems to have concluded, upon the facts, that the horse could have been sufficiently controlled, and taken back to the defendant's stable without a resort to the act of violence which resulted so unfortunately.

The defendant's drivers were the sole witnesses produced as to the facts at the time of the injury, and their testimony is uncontradicted. But, as employés of the defendant, and responsible for the acts complained of, they were interested witnesses; and it was for the justice to determine what reliance might be placed upon their sworn opinions that it was necessary to throw the horse. He might well come to a different conclusion from the facts which they stated, and we see nothing in the case which warrants us in disturbing his finding. The driver Solosky said:

"He was half way on the sidewalk, and we tried to pull him down. Q. Did you yank his head around, and pull him down? A. I did not have the lines. I was holding his head. Q. And you threw him down? A. Yes, sir. Q. Did he fall on the curb or sidewalk? A. Out in the gutter. Q. Did he strike himself when he fell down? A. His feet went right from under him. Q. And, after he got up, he did not go lame, did he? A. No, sir; not right away. Q. But he did afterwards? A. Well, he walked all the way home from Forty-Eighth to Eleventh street."

The driver Croghan said:

"His foremost feet were on the sidewalk. Q. And you were in the wagon? A. I was sawing on the lines. Q. And was he plunging? A. This man was at his head, trying to hold him. He jumped out of the wagon as soon as he thought he would get away from us. Q. And you succeeded in throwing the horse? A. We had to do it. Q. You knocked him down, did you not? A. Yes, sir; and he seemed to be a little lame. We drove him home about 10 or 15 minutes after that."

The veterinary surgeon testified:

"If I understand the witness properly, he said the horse fell with his forward feet on the curb, and his hind ones in the gutter. In falling that way, a horse is very liable to create a partial fracture of the bones, especially the long bones of the leg. * * * Ordinary travel for that distance would cause it to split the rest of the bone."

It is true that the defendant testified that the horse was lame when he first used him, but this hardly agrees with the description of his lively behavior at and after that time. When he was lamed

by being thrown, afterwards, he was got back to his stable without difficulty. Notwithstanding his unruly behavior on the first trial, he was evidently deemed by the defendant worth a second trial. All these facts had weight, no doubt, with the justice. There was no evidence given by the defendant as to the value of the horse, so as to afford a basis for an allowance on the ground of breach of warranty, or for false representation; and a verdict for the full amount of the purchase money, being the face of the check sued upon, was proper.

The defense that the plaintiff was not the real party in interest was not sustained. He was the owner of the horse, and the defendant's check was indorsed over to him by the auctioneers. He had title, therefore, to it, and the right to sue upon it.

Our disposition of the case makes it unnecessary to consider whether the description in the catalogue before the warranty was a fraudulent representation; for, conceding that it was, and that it entitled the defendant to rescind the sale and return the animal, he was bound to return him in the condition in which he received him, with the qualification already stated.

Error is claimed with respect to the admission of evidence concerning a horse, lot No. 122. This evidence was admissible, because it was sworn that it was the same horse sold to the defendant, and which had been sold a week previous to plaintiff. The justice did not admit evidence concerning a different animal. It was only a question of identity.

The judgment must be affirmed, with costs. All concur.